# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**OCWEN LOAN SERVICING, LLC,**

      **Plaintiff,**

-vs-                                            Case No. 6:08-cv-214-Orl-31GJK

**ACCREDITED HOME LENDERS, INC.,**

      **Defendant.**

## ORDER

    This matter comes before the Court on the cross-motions for summary judgment filed by the Plaintiff, Ocwen Loan Servicing, LLC ("Ocwen") (Doc. 57), and by the Defendant, Accredited Home Lenders, Inc. ("AHL") (Doc. 73). The Court has also considered Ocwen's response (Doc. 74) to AHL's motion and AHL's reply (Doc. 77) to Ocwen's response.[1]

**I.    Background**

    AHL is the successor in interest to Aames Capital Corporation ("Aames"). (Doc. 73 at 10). Aames originated 2,248 mortgage loans and in 2006 transferred them to UBS Real Estate Securities, Inc. ("UBS"). UBS subsequently transferred the loans to Mortgage Asset Securitization Transactions, Inc. ("MAST"), which in turn transferred them into MASTR Asset-Backed Securities Trust 2006-AM3 (the "Trust").

---

[1] The Court has also reviewed AHL's response (Doc. 66) to Ocwen's motion for summary judgment, which merely incorporated the arguments made by AHL in its motion.

Aames agreed to repurchase any of those 2,248 loans whose borrowers fell 30 days behind in their payments within the first 90 days, and 90 days behind within the first year. Such loans are defined in the contracts at issue here as "Super Delinquent" mortgage loans. As the successor in interest to Aames, AHL does not dispute that it is also obligated to repurchase any Super Delinquent mortgage loans.

Ocwen contends that AHL has breached its obligation to repurchase Super Delinquent mortgage loans from the Trust and seeks to compel AHL to repurchase 38 such loans at a price of $7,055,194.62.[2] AHL contends that Ocwen is not the proper party to bring the instant suit.[3]

## II. Legal Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Whether a fact is material depends on the substantive law of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If there is an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof, that party must "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and

---

[2]The actual value of the 38 loans exceeds the $7,055,194.62 figure, but Aames' repurchase obligation was contractually capped at the amount.

[3]Though not admitting them, AHL does not dispute any of the other factual or legal bases underlying Ocwen's motion for summary judgment.

citation omitted). Summary judgment is mandated against the non-moving party who thereafter fails to present sufficient evidence to establish a genuine issue of fact for trial. *Id.* at 322, 324-25.

## III. Application

AHL challenges Ocwen's authority to bring this suit on both real-party-in-interest grounds and contractual standing grounds.

<u>Real Party in Interest</u>

All federal actions must be prosecuted in the name of the real party in interest. Fed.R.Civ.P. 17(a). The purpose of the real party in interest rule is to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper *res judicata* effect. *Steger v. General Electric Co.*, 318 Fl.3d 1066, 1080 (11th Cir. 2003) (citing Rule 17 advisory committee notes (1966)). A real party in interest defense is not jurisdictional, and because it is intended to benefit the defendant, it is freely waivable. *Id.*

This case was filed in February 2008, and AHL filed its answer in March 2008. AHL first raised concerns about Ocwen's standing in its motion for summary judgment, filed in December 2008.[4] Although they were not filed with the complaint, Ocwen contends – and AHL does not

---

[4]AHL tries to argue that it raised this issue in its affirmative defenses. Even given the most generous interpretation, the boilerplate defenses on which AHL seeks to rely do not provide notice of any challenge to Ocwen's authority to bring this suit. One of the cited defenses asserts (without explanation) that Ocwen's claim is "barred by the terms and conditions of the contracts that are the subject of this lawsuit" (Seventeenth Defense); another simply denies that Ocwen "has been damaged by Defendant" (Second Defense). (Doc. 10 at 4, 1). The final affirmative defense on which AHL would rely asserts that Ocwen's claim is barred "because the damages alleged were not caused by the breaches or actions of Defendant and are otherwise too speculative to allow recovery" (Eleventh Defense). (Doc. 10 at 3). Each of these defenses attacks Ocwen's claim, but none of them suggest that some other party ought to be bringing it. AHL also argues that it raised the issue in its April 2008

dispute – that AHL has had all of the pertinent contracts in its possession since at least March 2008. AHL does not provide any explanation for its failure to raise this issue until December 2008. (AHL's argument is based entirely on the language of the contracts at issue; no factual discovery was required to substantiate it.) In addition, AHL offers no explanation as to how it might face multiple obligations, given what Ocwen seeks here – *i.e.*, to compel AHL to repurchase the capped amount of $7,055,194.62 worth of mortgage loans from the Trust. This is particularly true given that AHL is no longer contesting its obligation to repurchase the mortgage loans, merely Ocwen's status as the entity with the power to compel it to do so. Given AHL's delay in raising the issue, and its inability to demonstrate that it might face multiple obligations or that any judgment entered here might not have proper *res judicata* effect, the Court finds that any real party in interest defense has been waived.

Contractual Standing

The transfer of the mortgage loans from Aames into the Trust was accomplished by three separate but somewhat interrelated contracts. The contract accomplishing the transfer of the mortgage loans from Aames to UBS – the "Master Seller's Purchase, Warranties and Interim Servicing Agreement" (the "Purchase Agreement") – was dated April 1, 2006, and UBS and Aames were the only parties to it.[5] (PA at 1). On October 31, 2006, UBS, Aames, and MAST

---

response to Ocwen's initial motion for summary judgment, but after reviewing that document, the Court finds that argument is even flimsier, and does not warrant serious discussion.

[5]Citations to the Purchase Agreement, which is attached as Exhibit C to Ocwen's first motion for summary judgment (Doc. 15), will follow the format "(PA at __)".

entered into an Assignment and Recognition Agreement (the "ARA"),[6] pursuant to which, among other things, UBS sold the loans to MAST. (ARA at 1). Finally, on the same date – October 31, 2006 – MAST transferred the mortgage loans to the Trustee – U.S. Bank National Association ("US Bank") – in trust for certain certificateholders by way of a Pooling and Servicing Agreement (the "PSA").[7] (PSA at 67, 72). Aside from US Bank, the other parties to the PSA were Ocwen as the Servicer for the Trust and Wells Fargo Bank, N.A. ("Wells Fargo") as the Master Servicer and Trust Administrator. (PSA at 1). All three contracts provide (and the parties agree) that they are to be construed in accordance with New York law.

Under New York law, construction of an unambiguous contract is a matter of law. *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007). The court should construe the agreement so as to give full meaning and effect to the material provisions, and should not read the contract in a way that renders any portion meaningless. *Id.*

The contracts set forth a number of repurchase obligations that apply under different circumstances. The repurchase obligation that Ocwen seeks to enforce here is found at Section III(3) of the ARA. Section III of the ARA is titled "Representations, Warranties, and Covenants." (ARA at 2).[8] Section III(3) provides, in pertinent part:

---

[6] Citations to the ARA, which is attached as Exhibit B to Ocwen's first motion for summary judgment (Doc. 15), will follow the format "(ARA at __)".

[7] Citations to the PSA, which is attached as Exhibit A to Ocwen's first motion for summary judgment (Doc. 15), will follow the format "(PSA at __)".

[8] Sections III(1), III(2), and III(4) of the ARA consist of various promises by Aames or UBS, such as that Aames is "duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation" and that none of the loans are governed by the Georgia Fair Lending Act. (ARA at 2-3). Section III(2) carries forward certain promises originally made in the Purchase

> In the event that (1) any Mortgage Loan becomes thirty (30) days past due at any time on or prior to the first (1st) day of the fourth (4th) full month following the related Closing Date (as defined in the Purchase Agreement) (each, a "Delinquent Loan"), (2) [Aames] is notified of such delinquency within sixty (60) days after the date on which such Mortgage Loan becomes a Delinquent Loan, (3) such Delinquent Loan subsequently becomes ninety (90) days past due at any time on or prior to the one-year anniversary of the related Closing Date (as defined in the Purchase Agreement) (each, a "Super Delinquent Loan") and (4) [UBS] requests that [Aames] repurchase such Super Delinquent Loan within sixty (60) days of the date on which such Mortgage Loan becomes a Super Delinquent Loan, then [Aames] shall repurchase the related Super Delinquent Mortgage Loan;

(ARA at 2).[9]

To establish its authority to enforce the repurchase obligation of Section III(3) even though it was not a party to the ARA, Ocwen points to Section II of that document, titled "Recognition of the Company."[10] Pursuant to Section II of the ARA, Aames recognizes that MAST "will transfer the Mortgage Loans and assign its rights under the Purchase Agreement (solely to the extent set forth herein) and this Agreement to [the Trust]". (ARA at 1). Section II of the ARA also provides that

> the Trust (including the Trustee, the Trust Administrator, the Master Servicer, and the Servicer acting on the Trust's behalf) shall have all the rights and remedies available to [UBS] insofar as they relate to the Mortgage Loans under the Purchase Agreement . . . and shall be entitled to enforce all of the obligations of [Aames] thereunder insofar as they relate to the Mortgage Loans . . . .

Agreement. (ARA at 2).

[9] The remainder of Section III(3) provides that, under certain conditions, Aames may substitute other loans for Super Delinquent loans, rather than repurchasing them, and caps Aames' repurchase obligation at 9.9% of the value of the total pool of mortgage loans. (ARA at 3).

[10] Under the ARA, Aames is defined as the "Company". (ARA at 1).

(ARA at 1-2). As AHL points out, the latter portion of Section II only empowers Ocwen to enforce Aames' repurchase obligations under the Purchase Agreement, not the ARA, and it is the ARA that sets forth Aames' obligation to repurchase Super Delinquent mortgage loans. In addition, although the first-quoted passage of Section II provides notice that MAST will transfer all of its rights under the ARA to the Trust, unlike the latter passage it does not state that those rights will also be transferred to other entities, including the Servicer acting on the Trust's behalf. Thus the argument that Section II of the ARA itself gives Ocwen the power to bring this suit fails.

For its part, AHL contends that the authority to enforce its obligation to repurchase the Super Delinquent mortgage loans resides in the Trustee, only, and is found at Section 2.03(a) of the PSA. That section provides, in pertinent part, that

> Upon receipt of written notice ... of the breach by [Aames] of any Representation, Warranty or Covenant under the [ARA] or the [PA] in respect of any Mortgage Loan **that materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders**, the Trustee shall [provide prompt notice and] request that [Aames] cure such defect or breach within 90 days ... and if the Trustee receives written notice ... that [Aames] has not ... cured such ... breach in all material respects during such period, the Trustee shall enforce the obligations of [Aames] under the [ARA] and/or [PA] to repurchase such Mortgage Loan . . . .

(PSA at 72) (emphasis added). AHL reads this passage as empowering the Trustee (but not the Servicer) to enforce any alleged breach of one of its obligations, including the promise it made at Section III(3) of the ARA to repurchase the Super Delinquent mortgage loans. Section III of ARA is titled "Representations, Warranties and Covenants," and thus AHL's failure to repurchase the Super Delinquent mortgage loans would appear to be the sort of breach that triggers Section 2.03(a) of the PSA, empowering the Trustee to enforce the obligation. But AHL's interpretation of this passage ignores the limitation imposed by the bolded text. The breach at issue is the

-7-

failure to repurchase a Super Delinquent mortgage loan. A failure to repurchase such a loan does not, itself, adversely affect the value of the loan or anyone's interest in it. As such, it would not trigger Section 2.03(a) of the PSA.

Ocwen argues that, even if the contracts do not give it the authority to enforce the Super Delinquent repurchase obligation, it has subsequently acquired that authority. Ocwen has provided an affidavit from Brian Giel, an assistant vice president of US Bank, the Trustee. In the affidavit, Giel states that US Bank "acknowledges that Ocwen brought this lawsuit on behalf of" the Trust, opines that Ocwen has the authority to bring a lawsuit on behalf of the Trust without including the Trustee, and states that "US Bank consents to Ocwen bringing this lawsuit on behalf of the [Trust]". (Doc. 74-3 at 1-2). Giel's opinion as to Ocwen's authority, under the contracts, to bring this suit on behalf of the Trust with or without the Trustee is not relevant. The interpretation of those contracts is a question of law for the Court to decide.

Even if, as AHL argues, US Bank (as Trustee) has the authority under the contracts to bring this suit, US Bank cannot solve a lack of standing on Ocwen's party by simply ratifying Ocwen's pursuit of this claim. Ocwen bases its argument to the contrary on New York law. Under New York law, contractual standing is not a jurisdictional issue. *See*, *e.g.*, *Wells Fargo Bank Minnesota, Nat. Ass'n v. Mastropalo*, 42 A.D.3d 239, 242-245 (N.Y. 2007). However, this is because the New York courts are courts of general jurisdiction, "competent to entertain all causes of action unless [their] jurisdiction has been specifically proscribed." *Thrasher v. United States Liab. Ins. Co.*, 225 N.E.2d 503, 506 (N.Y. 1967). Thus, because those courts are empowered to entertain contract disputes, a contract action brought by a complete stranger to the agreement would still fall within the jurisdiction of the New York courts. *Well Fargo* at 244. The

plaintiff's lack of standing would affect only the court's ability to grant judgment in favor of the plaintiff, not its jurisdiction, and the standing problem could be cured subsequent to the filing of the suit. *Id.*

Federal courts, however, are courts of limited jurisdiction, and the existence of a case or controversy is a prerequisite to their jurisdiction. U.S. Const. art. III, s. 2. Where the plaintiff lacks standing, there is no case or controversy, and the federal court lacks jurisdiction over the claim. *See*, *e.g.*, *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002). See also *Live Entertainment, Inc. v. Digex*, *Inc.*, 300 F.Supp.2d 1273, 1279-80 (S.D.Fla. 2003) (noting that where plaintiff lacks standing, plaintiff also lacks ability to substitute real party in interest under Rule 17(a)).

However, the Court finds that Ocwen possessed standing to pursue the contract claim at issue in this case. To establish standing pursuant to Article III, a plaintiff must, at a minimum, demonstrate (1) that it suffered an "injury in fact" – an invasion of a legally protected interest, (2) that there is a causal connection between the injury and the conduct complained of, and (3) that it is likely that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Cast in the language of *Lujan*, AHL's contractual standing argument – that Ocwen has no authority to enforce Section III(3) of the ARA – is an argument that Ocwen has not suffered an injury in fact, because it does not have a legally protected interest in that provision. (Obviously, the two other elements of standing are present in this case: any invasion of that interest would have resulted from AHL's conduct, and a judicial decision compelling AHL to repurchase the disputed mortgage loans would redress the injury.)

Although neither party pointed it out, Section V(3) of the ARA provides that "[t]his Agreement shall inure to the benefit of (i) the successors and assigns of the parties hereto and (ii) the Trust (including the Trustee, the Trust Administrator, the Servicer and the Master Servicer acting on the Trust's behalf)." (ARA at 4). Thus AHL's predecessor in interest agreed that the ARA – and the promise to repurchase the Super Delinquent mortgage loans – would benefit Ocwen (at least when, as here, Ocwen is acting on behalf of the Trust).[11] Therefore, to the extent that AHL has failed to repurchase the Super Delinquent mortgage loans, Ocwen has suffered an invasion of its legally protected interest in Section III(3) of the ARA. Ocwen therefore has standing to pursue this breach claim.

In addition, the United States Court of Appeals for the Eleventh Circuit has held that a district court "does not exceed its power when it takes jurisdiction over a controversy, even if not brought by the real party in interest, as long as there exists a substantial identity of interest between the original plaintiff and the true party in interest, and as long as the pleadings set forth the facts upon which the real party in interest would base its invocation of the court's jurisdiction in its own right." *Delta Coal Program v. Libman*, 743 F.2d 852, 856 (11th Cir. 1984).[12] Even if one assumes, as AHL argues, that only the Trustee has the right to pursue this claim, a review of

---

[11]Geil, an assistant vice president of the Trustee, states in his affidavit that Ocwen is acting on behalf of the Trust.

[12]In *Delta Coal*, a securities fraud and RICO case, thirty-five individuals were allowed to substitute for the original plaintiff – a limited partnership to which those individuals belonged. *Id*. at 853. The individuals (and not the limited partnership) were the "purchasers" under the securities statute at issue and the entities that were allegedly "injured in [their] business or property" under the RICO statute, making them the only entities entitled to pursue the claims that the limited partnership had originally raised. *Id.* at 854.

the pleadings and the Geil affidavit demonstrates that there is a substantial identity of interest between Ocwen and US Bank, and Ocwen has set forth the same facts US Bank would rely on. Thus, even if the Trustee is the real party in interest, the Court therefore possesses standing over this claim (and, as noted above, AHL waived any real party in interest defense).

### IV. Conclusion

Aside from raising the real-party-in-interest and standing issues, AHL did not contest Ocwen's entitlement to summary judgment. In consideration of the foregoing, it is hereby

**ORDERED** that the motion for summary judgment filed by the Plaintiff, Ocwen Loan Servicing, LLC (Doc. 57), is **GRANTED**, and the motion for summary judgment filed by the Defendant, Accredited Home Lenders, Inc. (Doc. 73), is **DENIED**. Ocwen is directed to file, on or before March 25, 2009, a proposed form of judgment. AHL may have until April 1, 2009 to file any objections to that proposed form of judgment.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 18, 2009.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party